Harry B. Frank, J.
Petitioners New England Petroleum Corporation ("Nepco”) and Grand Bahama Petroleum Co. ("Petco”) seek a preliminary injunction restraining the respondent Asiatic Petroleum Corporation ("Asiatic”) from, inter alia, terminating two contracts, dated April 1, 1972, between, respectively, Nepco and Asiatic, and Petco and Asiatic. The Nepco-Asiatic contract provides for the sale by Asiatic to Nepco of 38,000 barrels per day (plus or minus 10% at Nepco’s option), No. 6 fuel oil, during the period April 1, 1972 through March 31, 1978. The Petco-Asiatic contract provides for the sale by Asiatic to Petco of 30,000 barrels per day (plus or minus 10% at Petco’s option), No. 6 fuel oil, during the period April 1,1972 through March 31, 1978.
The terms of the respective contracts, material to the instant application, are identical, and all subsequent references herein to the terms of the two contracts shall be applicable to both contracts. It appears that all of the fuel oil which is the subject of the contracts is foreign export oil, exported primarily, or perhaps exclusively, from Venezuela. The terms of the contracts provide for certain alternatives by which the petitioners may absorb increases charged by the exporting country in taxes, royalties and fees, which increases are collectively known as "Host Government Take” or "HGT”. The petitioners have in fact absorbed enormous HGT increases since the inception of the specified contracts and the prices paid by Nepco and Petco for fuel oil under the contracts have, in the last three years, risen from $2.05 per barrel to $9.05 per barrel. Petitioners state that the HGT increases which they have paid since April 1, 1972 amount in the aggregate to about $7 per barrel or an increase of about $175,000,000 for anticipated 1975 deliveries.
Besides providing for such HGT increases paragraph 2(d)(iv) of the contracts provides: "In any event price renegotiation for fuel oils to be delivered during each calendar year after 1974 shall take place during the fourth calendar quarter of the preceding year, and any renegotiated price may include provision for increases or decreases corresponding to changes in *563 HGT during such year. The price for fuel oils to be delivered after the expiration of each one year period will be renegotiated by the parties during the last ninety (90) days of that one-year period and if the parties cannot agree on a new price for such oils either party shall have the right to terminate the Agreement upon sixty days written notice to the other; if neither party shall have terminated this Agreement, the Agreement will continue during the next calendar year at the price in effect prior to such renegotiation.” (Emphasis added.)
By correspondence dated September 13, 1974, Asiatic notified the petitioners that it wished to renegotiate the price for oil under the specified contracts, in accordance with the provisions of paragraph 2(d)(iv) quoted above. Although Asiatic initially sought an increase of $1 per barrel it subsequently modified its requested increase. Petitioners claim that Asiatic’s modified increase requests have been unreasonable, and that Asiatic has, in fact, negotiated in bad faith.
The "General Conditions of Sale” of the contracts in question contain the following arbitration clause: "Except as otherwise provided herein, any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration in the City of New York, New York, in accordance with the Rules of the American Arbitration Association, and judgment upon the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction thereof.”
Apparently predicated upon Asiatic’s claimed failure to negotiate the 1975 purchase price in good faith, the petitioners, under date of December 18, 1974, served demands for arbitration before the American Arbitration Association, in accordance with the requirements of the above quoted arbitration provision that any controversy or claim be settled by arbitration before that Association. Thereafter, by correspondence dated January 10, 1975, Asiatic served notice that it was terminating the specified contracts, effective March 2, 1975, based upon the failure of the parties to mutually agree upon an increased price.
Petitioners claim that Asiatic was aware, at the time of the execution of the April 1, 1972 contracts, that the No. 6 fuel oil to be acquired by the petitioners under those contracts was to be resold almost exclusively to Long Island Lighting Company ("Lilco”), a regulated public utility, with generating stations in Nassau County, Suffolk County, and the Rockaways, Queens *564 County, New York, and to Niagara-Mohawk ("Niagara”) also a regulated public utility with generating stations in Northern New York. In this regard petitioners claim that if Asiatic is not restrained from terminating the April 1, 1972 contracts, and those contracts are in fact terminated, the petitioners will be unable to purchase equivalent amounts of No. 6 fuel oil with which to supply Lilco and Niagara. Thus, the petitioners contend, that not only may they be forced to breach their supply contracts with those utilities and thereby suffer irreparable loss, but that, in the event the utilities in question are unable to find alternative sources for No. 6 fuel oil, incalculable damages may be caused to those segments of the public which are dependent on Lilco and Niagara for electrical power.
In opposition to petitioners’ application for preliminary injunctive relief, Asiatic claims that (1) it has not negotiated in bad faith regarding its requested price increase; (2) its requested fuel oil price increase is in fact consistent with or even below the prevailing market price for No. 6 fuel oil; (3) it will consent to immediately sell No. 6 fuel oil to the petitioners, in quantities called for under the terminated contracts, at a fair price consistent with the prevailing market price, and (4) it would also, in order to protect the public interest, be willing to supply petitioners’ customers with up to 70,000 barrels of fuel oil per day on an interim basis at the same prices offered to petitioners. Asiatic also claims that since the issue of whether it has attempted to negotiate an increase in purchase price in good faith is the identical issue to be considered in the pending arbitration proceeding, it would be improper for the court to grant a preliminary injunction, because in doing so it would in large measure be deciding the issue now pending before the arbitrators (citing Meda Int v Salzman, 24 AD2d 710; CPLR 7501). Parenthetically two of the required three-member arbitration panel have been selected and a third and last member is in the process of being selected. The American Arbitration Association has advised the court that the selection of the third and last arbitrator may be completed by February 25,1975.
In Meda Int v Salzman (supra) relied upon by the respondent as authority for the proposition that the court may not properly grant an application for a preliminary injunction where the parties have agreed to arbitrate their disputes, the Appellate Division, First Department initially concluded that *565 factual issues therein precluded the granting of preliminary injunctive relief and then noted that ultimate relief could be granted by the arbitrators, to whom the parties had agreed to submit their disputes, through the arbitrators’ exercise of their equity powers (see also, Matter of Ruppert [Egelhofer], 3 NY2d 576; 70 ALR2d 1055). Under certain circumstances, however, where a clear right to relief has been demonstrated and there has been a showing that irreparable injury will be incurred unless preliminary injunctive relief is granted, the court may grant such relief, even though the parties have agreed to submit their underlying dispute to arbitration (E. F. Hutton & Co. v Bokelmann, 56 Misc 2d 910; American Eutectic Welding Alloys Sales Co. v Flynn, 161 A2d 364). While parties may have agreed to arbitrate their underlying dispute they should not, by virtue of that agreement, necessarily be precluded from obtaining preliminary injunctive relief (which is perhaps the only means of maintaining the status quo pending an opportunity to arbitrate their dispute upon the merits) especially where it can be clearly demonstrated that they will suffer irreparable injury unless the status quo is maintained. Nonetheless, courts may be understandably reluctant to grant preliminary injunctive relief, where the parties have agreed to submit their disputes to arbitration, for not only do the courts not wish to interfere with the jurisdiction of the arbitrators, but the courts lack the control which they normally exercise over litigated matters, arbitration proceeding as it does in another forum.
In the instant proceeding the petitioners have conspicuously failed to demonstrate a clear right to preliminary injunctive relief. The submission before the court is patently inadequate to show that Asiatic was negotiating in bad faith regarding the 1975 fuel oil purchase price under the specified contracts. Petitioners’ argument that the fuel oil market is a controlled market resulting in arbitrary price demands may be a proper subject for antitrust litigation, but such issues are obviously beyond the scope of the instant application. As noted above, Asiatic has stated it will supply to either the petitioners or their customers fuel oil in quantities called for under the contract in question, at prices consistent with those prevailing in the market. Admittedly, since the inception of the contracts in question there has been a dramatic increase in the prices which the petitioners are paying for the fuel oil contracted for. Those increases, however, have been the result of in *566 creases in the HGT paid to the exporting countries. Since it does not appear that Asiatic has profited from HGT increases and since there has been no clear showing that Asiatic acted in bad faith in negotiating the 1975 fuel oil purchase price increase under the specified contracts, petitioners’ application for a preliminary injunction must be denied (Park Terrace Caterers v McDonough, 9 AD2d 113, 114; Barricini, Inc. v Barricini Shoes, 1 AD2d 905).